'09 CIV 5714

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PLATINUM LONG TERM GROWTH, LLC and LAKEWOOD GROUP, LLC<br><br>Plaintiffs,<br><br>v.<br><br>FIRSTGOLD CORP., STEVEN C. AKERFELDT, A. SCOTT DOCKTER, JAMES W. KLUBER, and STEPHEN R. TIBBALS,<br><br>Defendants. | Case No. _____<br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |



Plaintiffs have alleged the following based upon their personal knowledge as to their own actions and as to the statements that were made by defendants to plaintiffs regarding the investment at issue herein, as well upon the investigation of plaintiffs' counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings by defendant Firstgold Corp. ("Firstgold") and press releases and other public statements issued by Firstgold.

## NATURE OF THE ACTION AND SUMMARY OF ALLEGATIONS

1. This an action by Platinum Long Term Growth, LLC ("Platinum") and Lakewood Group, LLC ("Lakewood") (collectively, "Plaintiffs"), seeking damages for their losses resulting from misrepresentations by Firstgold and various of its officers and directors that induced Plaintiffs to buy certain notes and warrants from Firstgold. Based on defendants' misrepresentations, Plaintiffs paid to Firstgold $9,713,978.54 for the notes and warrants, much of which has been lost as a result of the falsity of defendants' representations, which materially misstated the business, financial position and mining operations and prospects of Firstgold. Firstgold and the officer and director defendants knew or recklessly disregarded that their representations were false and they made them to induce Plaintiffs to

purchase the notes and warrants. Plaintiffs allege defendants' violations of the Securities Exchange Act of 1934 (the "Exchange Act"), common law fraud, and negligent misrepresentation.

2.     Firstgold at all relevant times was in the business of acquiring, exploring and developing gold properties and extracting gold. Firstgold's principal assets include various mineral leases associated with the Relief Canyon Mine near Lovelock, Nevada, along with various items of equipment located at that site. The Company claims to currently have leases to over 10,000 acres of prime exploration property in Nevada.

3.     As of July 2008 defendants represented that Firstgold had substantially completed construction of its gold processing plant at its flagship property, the Relief Canyon Mine. Firstgold sought an investment from Plaintiffs to enable Firstgold to activate the plant and start operations in the fall of 2008. Defendants stated that they urgently – within a matter of weeks – needed money for working capital, the purchase of a bond to secure necessary permits, and other purposes.

4.     Defendants said that they urgently needed working capital, among other things, to start their reprocessing of ore in the "heaps" or the "old heaps," at the Relief Canyon Mine. Defendants said that the heaps were huge piles of materials in the Relief Canyon Mine that had been mined for gold by others, but which still contained substantial gold that Firstgold, through its new equipment and facilities, would be able to extract.

5.     In July and August 2008, the Individual Defendants, to induce Plaintiffs to provide such monies to Firstgold, made false written and oral representations to Plaintiffs as to the business, financial position, mining operations, and prospects of Firstgold, including statements and information about (1) Firstgold's expected recovery of gold, including with respect to Firstgold's ore grades and recovery levels in the heaps and the monthly processing capability of its equipment; (2) anti-

2

dilution provisions in pre-existing warrants granted by Firstgold; and (3) Firstgold's overall business plan, budgets, and financial and mining prospects. Defendants further falsely represented that, by the first quarter of 2009, Firstgold would be mining the "pits" in the Relief Canyon Mine, areas of the mine that, unlike the heaps, had not previously been mined for gold, and which therefore, defendants said, would yield even more gold than the heaps.

6.      Based on defendants' misrepresentations, Plaintiffs, two New York based investment firms, bought certain notes (the "Notes") and warrants (the "Warrants") from Firstgold for $9,713,978.54, as reflected, *inter alia*, in the August 7, 2008 Note and Warrant Purchase Agreement between Plaintiffs and Firstgold (the "Agreement"). The Notes were original issue discount notes, each reflecting an original issue discount of 15%, and had a face value of $12,000,000.

7.      In the period from August 7, 2008 through September 29, 2008, Plaintiffs funded the Notes, delivering the foregoing $9,713,978.54 to Firstgold pursuant to the Agreement and the Notes for the $12,000,000 of face value Notes.

8.      The representations defendants had made to induce Plaintiffs to purchase the Notes and Warrants were materially false and misleading in that they misrepresented the truth about Firstgold and failed to disclose material adverse information about Firstgold. As to its mining operations, defendants materially overstated Firstgold's ore grades and recovery levels in the heaps and equipment capabilities, and consequently its expected recovery of gold. Contrary to Firstgold's representations, its pre-existing warrants had "exploding warrant" provisions that impeded Firstgold's raising of additional capital. Firstgold's financial and operational position and prospects were materially worse than defendants had represented. Firstgold did not start mining the pits in the Relief Canyon Mine in the first quarter of 2009 and, to date, has not started doing so.

3

9.      Indeed, Defendant Stephen Tibbals recently admitted to a representative of Plaintiffs that defendants knew that the ore grades and recovery levels for the heaps at Relief Canyon were materially overstated in the Business Plan and Annual Cash Flow statements provided to Plaintiffs in July 2008 to induce them to purchase the Notes and Warrants. Tibbals stated that he had personally discussed with defendant Scott Dockter that the recovery rates provided in these materials were not accurate and had tried to get Docktor to use accurate numbers as to Firstgold's mineral grades and recovery rates in the heaps at the Relief Canyon Mine.  Tibbals also disclosed that Firstgold had had laboratory reports prepared by McClelland Laboratories, Inc. in January 2007 and Kappes Cassiday & Associates in 2008 showing significantly lower gold recovery rates at Relief Canyon than those presented to Plaintiffs to induce the investments at issue herein.

10.     Because defendants' representations, including as to Firstgold's ore grades and recovery levels in the heaps and equipment capabilities were false, Firstgold, from the very beginning, did not generate cash flow to make the payments required on the Notes.

11.     Commencing on December 15, 2008 and continuing in each month thereafter, Firstgold was required, *inter alia*, to make monthly principal reduction payments equal to the greater of: i) 40% of the Company's free cash flow (as defined in the Agreement) in the preceding calendar month, and ii) $400,000.

12.     Firstgold defaulted on its payment obligations to Plaintiffs under the Agreement and Notes, giving rise to Events of Default causing the entire principal amount and accrued interest to become due.  Firstgold is currently in default in the amount of some $13,776,465.18  under the Agreement and Notes, considering the interest on the $12,000,000 face value of the Notes.

13.     On April 23, 2009, Firstgold announced that its Board of Directors had retained the services of Haywood Securities Inc. to assist Firstgold in identifying and evaluating various

4

financing, restructuring and strategic alternatives, including the ultimate sale and/or merger of

the Company. Firstgold's CEO, defendant Steve Akerfeldt, commented: "To this end the

Company has already begun discussions with three interested parties and plans to move

expeditiously to conclude a transaction we believe would best suit our shareholders. We will also

be working with our two major lenders to allow sufficient time for us to develop these alternative

strategies." Firstgold also announced that it had suspended all mining and exploration activities

at Relief Canyon:

> Until new financing can be obtained to bridge the gap between start up of the
> mine and cash flow from production, the Company has been forced to suspend
> any additional crushing activity at the plant and will run its operations on a care
> and maintenance basis until such time as full operations can be restored.

> [Akerfeldt also stated:] "The equity and credit markets have become very difficult
> to access for companies like Firstgold. Currently Firstgold, *in addition to being in
> breach of its debt obligation to lenders*, has approximately $3.7 million dollars in
> payables that cannot be repaid until new financing has been obtained...."
> (Emphasis added).

14.     On April 24, 2009, the Company issued a press release announcing that the

Toronto Stock Exchange had placed Firstgold on Delisting Review. The press release stated:

> April 24, 2009, Cameron Park, CA - Firstgold Corp. (TSX: FGD, OTCBB:
> FGOC) (the "Company") received notice from the Toronto Stock Exchange
> ("TSX") on April 23, 2009 that the TSX is reviewing the common shares of the
> Company with respect to meeting the continued listing requirements for the
> TSX. The Company has been granted 30 days in which to regain compliance
> with these requirements, pursuant to the Remedial Review Process. At the end of
> the 30 day period, the TSX will determine if the Company is in compliance with
> listing standards and if not, could proceed with delisting the Company's shares.

> Steve Akerfeldt, Firstgold Chairman and CEO commented, "As we indicated in
> our most recent press release we are actively reviewing with our advisors all
> options with respect to the sale and or merger of Firstgold. We do not believe this
> notice will have any material impact on our discussions and /or current
> negotiations. We would hope to be in a position to regain compliance within the
> allotted time of the review period."

15.     On or about April 24, 2009, Firstgold filed a Report on Form 8-K which stated, among other things:

> On April 22, 2009 the two Lenders, citing the Company's failure to pay the April 15, 2009 loan payment as a subsequent default event, delivered a Notice of Default and demanded the entire principal and interest be paid by April 27, 2009.
>
> In light of this default event, the Company's Board has retained the services of Haywood Securities Inc. to assist the Company in identifying and evaluating various financing, restructuring and strategic alternatives. The Company will also be working with the two lenders to attempt to secure additional time for the Company to develop these alternative strategies.

16.     On May 1, 2009, the Company filed a notification with the SEC of its inability to timely file its Annual Report on Form 10-K, citing Firstgold's current financial position for its inability to pay for the completion of the audit of its financial statements for the fiscal year ended January 31, 2009.

## JURISDICTION AND VENUE

17.     The claims asserted herein arise under, among other things, Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder by the SEC [17 C.F.R. §240.10b-5].

18.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§1331 and 1337 and Section 27 of the Exchange Act [15 U.S.C. §78aa].

19.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. §1391(b), and 28 U.S.C.S. §1391 (allowing for suit against an alien defendant in "any district"). Many of the acts charged herein, including the dissemination of materially false and misleading information, occurred in substantial part in this District. Further, both of the Plaintiffs are located in this District.

20.     In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails and interstate telephone and internet communications.

## PARTIES

21.     Plaintiff Platinum Long Term Growth, LLC ("Platinum") is a Delaware limited liability company with its principal place of business at 152 West 57th Street, 4th Floor, New York NY 10019. As set forth herein, Platinum purchased the Notes and Warrants from Firstgold based on defendants' misrepresentations. Platinum's and Lakewood's respective participation in the Notes and Warrants were 80% and 20%, respectively.

22.     Plaintiff Lakewood Group ("Lakewood") is a Delaware limited liability company with its principal place of business at 152 West 57th Street, 54th Floor, New York NY 10019. As set forth herein, Lakewood purchased Notes and Warrants from Firstgold based on defendants' misrepresentations.

23.     Defendant Firstgold at all relevant times has been in the business of acquiring, exploring, and developing gold properties and extracting gold. Firstgold is incorporated in Delaware and has its headquarters at 3108 Ponte Morino Drive, Suite 210, Cameron Park, CA 95682. The Company's common stock trades in the US on the OTCBB under the symbol "FGOC" and, since May 14, 2008, on the Toronto Stock Exchange ("TSX") under the symbol "FGD," although that listing is currently in default.

24.     Defendant Steven C. Akerfeldt ("Akerfeldt") has been Chief Executive Officer of Firstgold since January 11, 2008 and Chairman of the Board of Directors since June 2007. He has been a member of the Board of Directors since September 12, 2006. From 1974 through 1987 Akerfeldt was a partner at Coopers & Lybrand. Akerfeldt is also the Chairman of Omnirock, Inc., a

7

wholly owned subsidiary of Firstgold, and the signator on documents reflecting the Notes and Warrants, including the Note and Security Agreements and Guaranty. Akerfeldt executed an "Officer's Certificate" dated as of August 6, 2008, certifying the truth and correctness of the representations and warranties of Firstgold in the Agreement. He also signed the Agreement, the Notes, and other contract documents between the Parties.

25.     Defendant A. Scott Dockter ("Dockter") is Founder and Chief Operating Officer of Firstgold and was CEO of Firstgold from November 1996 until February 2000 and from December 2000 until January 2008. He was Chairman of the Company from December 2000 through June 2007. Dockter beneficially owns at least 14 million shares of Firstgold.

26.     Defendant James W. Kluber ("Kluber") has been Chief Financial Officer of Firstgold since February 2000. Additionally, he was a Director from April 2000 through June 2007.

27.     Defendant Stephen R. Tibbals ("Tibbals") has at all relevant times been Firstgold's Relief Canyon Mine Manager in Lovelock, Nevada. Tibbals is listed on Firstgold's website as one of seven members of Firstgold's "Team." As the member of Firstgold's Team working on-site at the Relief Canyon mine and the manager of the mine, Tibbals was privy to confidential and proprietary information concerning the ore grades, recovery levels, and processing capabilities of the mine. He was in constant contact with the officers and directors of the Company concerning such matters and provided information directly to Plaintiffs when they were considering the investment at issue herein.

28.     Defendants Akerfeldt, Dockter, Kluber and Tibbals are referred to herein as the "Individual Defendants." Each of the Individual Defendants provided false information to Plaintiffs to induce them to purchase the Notes and Warrants. Through his execution of the August

8

6, 2008 Officer's Certificate, along with his execution of the Agreement, Notes and other contract documents, Akerfeldt certified the truth and correctness of the representations and warranties of Firstgold in the Agreement. Dockter and Tibbals, with the participation of Akerfeldt, made the misstatements alleged herein, *inter alia*, as to Firstgold's expected recovery of gold, particularly with respect to Firstgold's ore grades and recovery levels in the heaps and the monthly processing capability of its equipment at the Relief Canyon mine. Kluber made, *inter alia*, the misrepresentations described hereinafter, *inter alia*, that the warrants Firstgold had previously issued to Cornell Capital were not "exploding warrants" that would interfere with Firstgold's ability in the future to raise capital.

29.     Each of the Individual Defendants, as senior executive officers and/or directors of Firstgold, was privy to confidential and proprietary information concerning Firstgold, its operations, finances, financial condition, present and future business prospects, including the prospects at Relief Canyon. The Individual Defendants also had access to material adverse non-public information concerning Firstgold, as discussed in detail below. Because of their positions with Firstgold, the Individual Defendants had access to non-public information about Firstgold's business, finances, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or recklessly disregarded the fact that information provided to Plaintiffs to induce the investment was false and that adverse facts specified herein had not been disclosed to, and were being concealed from, Plaintiffs.

30.    Each of the defendants is liable as a direct participant in, and a coconspirator with respect to the wrongs complained of herein. In addition, the Individual Defendants, by reason of their status as senior executive officers, directors, and, in the case of Defendant Tibbals, Plant Manager of Firstgold's mine, were each a "controlling person" within the meaning of Section 20 of the Exchange Act and had the power and influence to cause the Company to engage in the unlawful conduct complained of herein. Because of their positions of control, the Individual Defendants were able to and did, directly or indirectly, control the conduct of Firstgold's business.

31.    The Individual Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of the documents and other information represented to Plaintiffs to induce them to purchase the Notes and Warrants. The Individual Defendants were provided with copies of the documents and information alleged herein to be misleading and had the ability and opportunity to prevent the making of such misrepresentations to Plaintiffs. The Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

## PLAINTIFFS' INVESTMENT IN FIRSTGOLD

32.    On August 7, 2008, Plaintiffs, pursuant to the Agreement, agreed to purchase the Notes and Warrants from Firstgold. The Notes were classified as original issue discount Notes, each reflecting an original issue discount of 15%.

33.    Pursuant to the Agreement, Plaintiffs received the Warrants to purchase 15,000,000 shares of Firstgold's common stock at a specified exercise price. The Warrants had a term of 3 years and provided for a Put Right pursuant to which Plaintiffs, starting August 7, 2009, could require the Company to repurchase the Warrants at a redemption price of $.30 per

Warrant, for an aggregate redemption amount of $4,500,000. The Put Right was exercisable for a period of one year.

34.     In the period from August 7, 2008 through September 29, 2008, Plaintiffs, pursuant to the Agreement, bought $12,000,000 of Notes from Firstgold, paying Firstgold $9,713,978.54 for them.

35.     The Agreement and Notes required that, commencing in December 2008 and continuing in each month thereafter, the Company would make monthly principal reduction payments equal to the greater of: i) 40% of the Company's free cash flow (as defined in the Agreement) in the preceding calendar month, and ii) $400,000.

36.     Defendant Ackerfedlt signed the Agreement, the Notes, and other contract documents on behalf of Firstgold. Pursuant to the Agreement, defendant Akerfeldt further signed an "Officer's Certificate" which represented the following, among other things: "The representations and warranties of the Company contained in the Purchase Agreement are true and correct in all material respects as of the date hereof, except for the representations and warranties that speak as of a particular date, which shall be true and correct in all material respects as of each date."

37.     As described above, Firstgold has defaulted on the Agreement and the Notes in the current aggregate amount of $13,776,465.18.

**FIRSTGOLD'S REPRESENTATIONS IN THE AGREEMENT**

38.     Firstgold made numerous representations and warranties in the Agreement. Generally such representations are set forth in Article II titled "REPRESENTATIONS AND WARRANTIES" in Section 2.1 titled "Representations and Warranties of the Company," including representations as to the accuracy and completeness of the documents provided to Plaintiffs to induce them to buy the

11

Notes and Warrants and representations as to the anti-dilution rights of any holders of Firstgold

equity or debt securities.

39.     Firstgold, in Section 2.1(p) at page 9 ("Disclosure") of the Agreement, represented

that, to the best of its knowledge, the documents Firstgold provided Plaintiffs to induce to buy the

Notes and Warrants were accurate and complete:

> (p)     Disclosure.… To the best of the Company's knowledge, neither
> this Agreement or the Schedules hereto nor any other documents, certificates or
> instruments furnished to the Lenders by or on behalf of the Company or any
> Subsidiary in connection with the transactions contemplated by this Agreement
> contain any untrue statement of a material fact or omit to state a material fact
> necessary in order to make the statements made herein or therein, in the light of
> the circumstances under which they were made herein or therein, not misleading.

40.     Firstgold, in Section 2.1(c) at page 5 ("Capitalization") of the Agreement, represented

with respect to its financial structure, that, other than as disclosed in the Agreement, it was not

subject to anti-dilution rights as to any of its equity or debt securities:

> Except as provided on Schedule 2.1(c)(iv) hereto, the Company is not a party to
> or bound by any agreement or understanding granting registration or anti-dilution
> rights to any person with respect to any of its equity or debt securities.

### DEFENDANTS' MISREPERSENTATIONS IN THE DOCUMENTS AND OTHER INFORMATION PROVIDED TO P LAINTIFFS

41.     As noted above, Firstgold in Section 2.1(p) of the Agreement represented that the

documents presented to Plaintiffs with respect to the Notes and Warrants were accurate and

complete. The Individual Defendants presented numerous such documents to Plaintiffs to induce

them to make the investment, including the document headed: "Firstgold Corp./Relief Canyon

Mine/Nine Month Budget/Budget by Month/Steven Tibbals 1/7/2008" (the "Tibbals Budget"),

and the document titled "Firstgold Corp./Breaking New Ground" (the "Breaking New Ground

Memorandum").

42.     The Tibbals Budget projected Firstgold's gold production based upon Firstgold's processing of 440,000 tons of ore per month, based on the ore's having a grade of 0.015625, and based on Firstgold's having a recovery rate of 64%.  Specifically, Firstgold would crush and process 440,000 tons of ore, of which 0.015625% would be gold, of which Firstgold would extract 64%, *i.e.*, 440,000 times 0.015625 times 0.64, for a yield of 4,400 ounces of gold per month.

43.     These plant capacities, grades, and recovery rates were central to the viability of the Relief Canyon Mine and the validity of the investment on Plaintiffs' part.  They were discussed at great length between Plaintiffs' representatives in the negotiations, including Mark Mueller and consultant John Hedges, and Individual Defendants Docktor, Tibbals, and Akerfeldt in numerous discussions primarily in the last two weeks of July 2008 when Plaintiffs were considering the investment.

44.     Defendants Docktor and Tibbals repeatedly told Plaintiffs that they knew their operation at the Relief Canyon Mine and that that operation was capable of operating at this volume of operation and to extract gold at these grades and yields.  The matter was discussed at particular length in conference calls with defendants Docktor, Tibbals,  and Akerfeldt on or about July 30, 2008 in which Mark Mueller participated on behalf of Plaintiffs, along with Plaintiffs' consultant John Hedges, and several brokers.  Mr. Mueller was skeptical about the investment.  Defendants Docktor and Tibbals represented at great length that, from their work at the Relief Canyon Mine, they knew where the gold was, what its grade was and what their recovery rate was, and that their plant had the capability to operate at 440,000 tons/month.

45.     Defendants' Breaking New Ground Memorandum reinforced the capacity of the plant, stating that the plant had a peak capacity of 20,000 tons ore/day, which would support the processing of even more than 440,000 tons/month.

46.     These numbers of defendants as to the represented capacity and recovery rate of the plant and grade of the ore were central to Plaintiffs' decision to make the investment. They not only were the basis of the Firstgold projections presented to Plaintiffs, but also of Plaintiffs' projections that were then provided to defendants for confirmation, and confirmed by defendants.

47.     As noted above, Firstgold, in Section 2.1(c) of the Agreement, also represented that, except as set forth in Schedule 2.1(c)(iv) to the Agreement, Firstgold was not subject to anti-dilution rights as to  any of its equity or debt securities.

48.     Schedule 2.1(c)(iv) in turn disclosed only that the warrants that Firstgold had previously issued to Cornell Capital had price protection. It did not disclose that they were exploding warrants also having protection as to number.

49.     This point about the anti-dilution rights of other warrants was important to Plaintiffs because they wanted to make sure that the Cornell Capital warrants were not "exploding warrants" that would potentially give Cornell Capital an adjustment as to the number of warrants they held. Exploding warrants that provide holders with adjustment as to the number of warrants impede a company's ability to raise new capital.  Plaintiffs did not want to be in the position of making this investment in Firstgold if Firstgold had previously issued exploding warrants that could impede Firstgold's ability to raise additional capital in the future if it needed to do so to repay the Notes, redeem the Warrants, or otherwise fund Firstgold's operations.

50.     Defendant Kluber represented in an email to Plaintiffs dated July 28, 2008 that the Cornell Capital warrants received only price protection:

> The only anti-dilution features that exist in these warrants are standard clauses covering stock dividends, stock splits, etc. but not protection for additional stock and/or warrants that are issued by Firstgold. These warrants have price protection if any stock is sold at a price less then the conversion price of the warrants then in existence.

Generally, Firstgold's warrants have similar anti-dilution clauses as those mentioned above but nothing in addition to these clauses. Warrants issued related to the $650,000 convertible debt covered in question 16 below also have the same price protection as the Cornell Capital warrants issued in September 2006

## MATERIALLY FALSE AND MISLEADING STATEMENTS AND SCIENTER

51.     Defendants made the above representations to induce Plaintiffs to buy the Notes and Warrants. Said representations directly or proximately caused or were a substantial contributing cause of the damages sustained by Plaintiffs.

52.     Said representations were materially false and misleading in that they misrepresented the truth about the Company, its business and operations and failed to disclose material adverse information.

53.     Defendants made these misrepresentations knowingly or recklessly and for the purpose and effect of misleading Plaintiffs as to Firstgold's financial and operating conditions and prospects.

54.     In fact, Firstgold's equipment at the Relief Canyon had a capacity not of 440,000 tons/month or more but rather of a maximum of 150,000 tons/month. The grade of the gold contained within the previously created heaps at the Relief Canyon Mine was not 0.015625 but 0.008 or less. Firstgold's recovery rate from the heaps was less than half of the 64% defendants represented.

55.     The true facts as to the limits of Firstgold's system's capacity and recovery rate and as to the grade of the ore at the Relief Canyon Mine became evident in the months that followed Plaintiffs' investment.

56.     Defendant Tibbals on or about March 11, 2009 admitted to a representative of Plaintiffs that defendants knew that the ore grades and recovery levels for the heaps at Relief Canyon were

15

materially overstated in the Business Plan and Annual Cash Flow statements provided to Plaintiffs in July 2008 to induce them to purchase the Notes and Warrants. Tibbals stated that he had personally discussed with defendant Scott Dockter that the recovery rates provided in these materials were not accurate and had tried to get Docktor to use accurate numbers as to Firstgold's mineral grades and recovery rates. Tibbals also disclosed that Firstgold had had laboratory reports prepared by McClelland Laboratories, Inc. in January 2007 and Kappes Cassiday & Associates in 2008 showing significantly lower gold recovery rates at the Relief Canyon Mine than those presented to Plaintiffs to induce the investments at issue herein.

57.     The McClelland Laboratories report, for instance, as disclosed by Defendant Tibbals on or about March 11, 2009, showed an average recovery under ideal conditions of some 40%. The Kappes Cassidy report showed recoveries as low as 13%, 14%, and 18%.

58.     Defendants had also necessarily been aware of the capabilities of their processing equipment at the Relief Canyon Mine and had no basis for the 440,000 tons per month they represented the equipment to be capable of.

59.     Defendants further represented that, by the first quarter of 2009, Firstgold would be mining the "pits" in the Relief Canyon Mine, areas of the mine that, unlike the heaps, had not previously been mined for gold, and which therefore, defendants said, would yield even more gold than the heaps. Contrary to defendants' representations, Firstgold did not start mining the pits in the Relief Canyon Mine in the first quarter of 2009 and, to date, has not started doing so.

60.     Defendants' representations as to the absence of pre-existing exploding warrants were also false. In fact, as was known to defendants at the time, the Cornell Capital warrants were exploding warrants with anti-dilution protection that potentially accorded Cornell Capital

substantial additional warrants when new warrants or other convertible securities were issued, thereby impeding Firstgold's ability going forward to raise additional capital.

61.     The Defendants also failed to disclose the prior criminal conviction of defendant Dockter in the environmental/regulatory area. This fact, which was certainly known to defendant Dockter at the time, would have called into question Docker's credibility with respect to such matters.

## UNDISCLOSED ADVERSE INFORMATION

62.     Defendants materially misled the Plaintiffs by providing false and misleading statements and omitting to disclose material facts necessary to make defendants' statements, as set forth herein not false and misleading. Said statements and omissions were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company, its business and operations, as detailed herein.

63.     At all relevant times, the material misrepresentations and omissions particularized in this Complaint directly or proximately caused or were a substantial contributing cause of the damages sustained by plaintiffs.

64.     As described herein, the representations made by defendants to Plaintiffs, including statements to Plaintiffs inducing them to purchase the Notes and Warrants, were materially false and misleading, including, but not limited to statements about Firstgold's ore grades and expected recoveries of gold at the heaps, equipment capacities, financial forecasts, resource amounts and estimates, and anti-dilution provisions in pre-existing warrants.

## ADDITIONAL SCIENTER ALLEGATIONS

65.     As alleged herein, defendants acted with scienter in that defendants knew that the statements made to Plaintiffs to induce them to purchase the Notes and Warrants were materially false

and misleading and defendants knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws. As set forth elsewhere herein in detail, defendants, by virtue of their possession of information reflecting the true facts regarding Firstgold, their control over, and/or receipt and/or modification of Firstgold's materially misleading misstatements and/or their associations with Firstgold which made them privy to confidential proprietary information concerning Firstgold, participated in the fraudulent scheme alleged herein.

66.    Defendants were strongly motivated to commit the wrongdoing alleged herein because Firstgold needed to induce the investment by Plaintiffs to fund ongoing operations and defendants were also planning additional securities offerings in late 2008 and 2009 which would have been in jeopardy if the truth concerning the Relief Canyon Mine was known publicly.

## NO SAFE HARBOR

67.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Firstgold who knew that those statements were false when made.

18

## FIRST CLAIM

Violation Of Section 10(b) of
The Exchange Act And Rule 10b-5
Promulgated Thereunder Against All Defendants

68.    Plaintiffs repeat and reallege each and every allegation contained above as if fully
set forth herein.

69.    Defendants, and each of them, carried out a plan, scheme and course of conduct
which was intended to  and did: (i) deceive Plaintiffs as alleged herein; and (ii) cause Plaintiffs to
purchase the Notes and Warrants at artificially inflated prices.  In furtherance of this unlawful
scheme, plan and course of conduct, defendants, and each of them, took the actions set forth
herein.

70.    The Notes with a maturity of over nine months, are securities, as defined in
Section 3(a)(9) of the Exchange Act [15 U.S.C. §78c(a)(10)]. The Warrants are also securities
under the Exchange Act. Further, the Agreement provides that the securities issued in connection
with the Agreement complied with all federal and state securities laws.

71.    Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue
statements of material fact and/or omitted to state material facts necessary to make the statements
not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud
and deceit upon Plaintiffs in an effort to induce Plaintiffs to purchase the Notes and Warrants in
violation of Section 10(b) of the Exchange Act and Rule 10b-5.  All defendants are sued either as
primary participants in the wrongful and illegal conduct charged herein or as controlling persons as
alleged below.

72.    Firstgold and the Individual Defendants, individually and in concert, directly and
indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails,

engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Firstgold, as specified herein.

73.     These defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure Plaintiffs of Firstgold's value and performance and continued substantial growth, which included the making of, or the participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Firstgold and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business which operated as a fraud and deceit upon the Plaintiffs.

74.     The Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (i) the Individual Defendants were high-level executives, managers, and/or directors at the Company; (ii) the Individual Defendants were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports; and (iii) the Individual Defendants were aware of the Company's dissemination of information to Plaintiffs which they knew or recklessly disregarded was materially false and misleading.

75.     The defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth, in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing the true facts as to Firstgold's mining operations, pre-existing warrants,

20

operating condition and future business prospects from Plaintiffs. As demonstrated by defendants' overstatements and misstatements of the Company's business, operations and earnings, defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

76.     As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the price of Firstgold's securities was artificially inflated. In ignorance of the fact that the statements and omissions of defendants were materially false and misleading, Plaintiffs purchased Firstgold securities and were damaged thereby.

77.     At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. Had Plaintiffs known of the true financial condition and business prospects of Firstgold, which were not disclosed by defendants, Plaintiffs would not have purchased their Firstgold securities.

78.     By virtue of the foregoing, defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

79.     As a direct and proximate result of defendants' wrongful conduct, Plaintiffs suffered damages in connection with their respective purchase of the Notes and Warrants.

### SECOND CLAIM

Violation Of Section 20(a) Of
The Exchange Act Against the Individual Defendants

80.     Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

81.     Each of the Individual Defendants acted as a controlling person of Firstgold within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level

positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by the Company with the SEC and disseminated publicly, and statements made to Plaintiffs, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements which Plaintiff contends were false and misleading. The Individual Defendants were provided with or had unlimited access to copies of the Company's business plans, forecasts, reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

82.     In particular, the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had and in fact had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

83.     As set forth above, Firstgold and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint. By virtue of their position as a controlling person, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Firstgold's and the Individual Defendants' wrongful conduct, Plaintiffs suffered damages in connection with their purchases of the Notes and Warrants.

## THIRD CLAIM

### For Common Law Fraud Against All Defendants

84.     Plaintiffs repeat and reallege each and every allegation contained above.

22

85.     This Claim is brought by Plaintiffs against all defendants based upon common law principles of fraud.

86.     Each of the Defendants owed to Plaintiffs a duty of full disclosure, honesty, and complete candor, as well as a duty to exercise reasonable care and to make a reasonable and diligent investigation of the statements provided to Plaintiffs, including the statements identified above.

87.     For the purpose of inducing Plaintiffs to purchase the Notes and Warrants, and with knowledge, the intent to deceive, or reckless indifference to such investors, defendants employed a scheme and conspiracy to defraud as a part of which said Defendants made, or participated in the making of, material misrepresentations of fact to Plaintiffs, and as a further part of which defendants concealed the true facts, and being bound to disclose, omitted to state material facts as set forth above.  Those representations and statements were not true and defendants did not believe them to be true.  Said acts by defendants were fraudulent, oppressive and malicious.

88.     Plaintiffs, at the time of said representations and omissions, were ignorant of the falsity of these statements, and believed them to be true.  In reliance, directly and indirectly, upon said misrepresentations, and the fidelity, integrity and superior knowledge of defendants, and in ignorance of the true facts, Plaintiffs were induced to and did enter into the Transactions.  Had Plaintiffs known the true facts, they would not have taken such action.  By reason thereof, Plaintiffs have been damaged.

### FOURTH CLAIM

For Negligent Misrepresentation
Against All Defendants

89.     Plaintiffs repeat and reallege each of the foregoing paragraphs of this Complaint as if set forth in full, with the exception that previously stated assertions of intentional or reckless

23

misconduct of defendants and all references to fraud are not incorporated herein for purposes of this claim. For purposes of this claim, Plaintiffs allege that defendants' conduct was negligent and not intentionally, recklessly and/or grossly negligent.

90.     This count is brought by Plaintiffs against all defendants based upon common law principles of negligent misrepresentation.

91.     Defendants owed Plaintiffs a special duty of care, given the special relationship between Plaintiffs and defendants and such identifiable sources of duty, *inter alia*, as the following:

- Defendants' special knowledge, including of the true facts as to the Relief Canyon Mine as alleged herein;

- The securities laws applicable throughout the United States requiring defendants in selling securities to disclose all material facts and not make any material misstatements or omissions, and Plaintiffs' knowledge of such securities laws and reasonable expectation and reliance that defendants, in selling the Notes and Warrants to Plaintiffs, would comply therewith;

- Plaintiffs' reasonable expectation that defendants were aware of the true facts as herein alleged, including the true gold recovery rates in the heaps at the Relief Canyon Mine, and would disclose such facts to Plaintiffs in connection with selling the Notes and Warrants to Plaintiffs;

- The duty of the Individual Defendants to be informed as to the material facts as to Firstgold and as to the Agreement and their knowledge that Plaintiffs would reasonably expect the Individual Defendants to assure that the representations made to Plaintiffs in selling the Notes and Warrants to Plaintiffs would accurately present the material facts as to the Company and its affairs;

- The high level of competence and experience which defendants represented the Individual Defendants as having, including their many years in the mining industry;

- The fact that the relationship between the parties, arising out of contract and otherwise, was such that Plaintiffs, as investors towards whom defendants' sale efforts were directed to sell the subject securities, had the right in morals and good conscience, to rely upon defendants for accurate information as to Firstgold, and Firstgold and the Individual Defendants owed a duty to investors like Plaintiffs to provide such information with due care;

- The fact that the statements made by defendants to Plaintiffs were being made by defendants in the course of their business, profession and employment;

24

- The nature of the representations and warranties which the Individual Defendants knew the Company was making to Plaintiffs pursuant to the Agreement;

- Defendants' pecuniary interest in the sale of the Notes and Warrants; and

- The fact that the Agreement by its terms created a relationship of trust between defendants and Plaintiffs and a reasonable expectation by Plaintiffs that defendants were exercising reasonable care in the representations and warranties they were extending to Plaintiffs.

92. Defendants breached their duty to Plaintiffs by failing to investigate, confirm, prepare and review with reasonable care the information contained in the Agreement, Cash Flow projections, Business Plan and in the other representations made to Plaintiffs, as set forth herein, and by failing to disclose to Plaintiffs, among other things, the true facts alleged above and in failing to correct the misstatements, omissions and inaccuracies contained therein.

93. Defendants have negligently made false statements, misrepresentations and omissions of material fact to Plaintiffs in connection with selling the Notes and Warrants to Plaintiffs without regard for how those statements would affect Plaintiffs.

94. In making said misrepresentations and statements, as alleged above, defendants failed to state material facts necessary (i) in order to make the statements made, in light of the circumstances under which they were made, not misleading, and (ii) in order that Plaintiffs would have all of the material facts necessary for an informed decision. Among the direct and proximate causes of said misrepresentations and omissions to state material facts was the negligence and carelessness of defendants, and the absence of any reasonable basis for belief in the truth of such statements.

95. At the time of said misrepresentations and omissions, Plaintiffs were ignorant of their falsity, and believed them to be true. In reliance, directly and/or indirectly, on said misrepresentations and in reliance upon the superior knowledge and expertise of Defendants,

Plaintiffs were induced to and did purchase Firstgold Notes and Warrants. Had Plaintiffs known the truth, they would not have purchased the Notes or Warrants. By reason thereof, Plaintiffs have been damaged.

WHEREFORE, Plaintiffs demand relief and judgment, as follows:

(a)     Awarding Plaintiffs damages against all defendants, jointly and severally, as a result of defendants' wrongdoing, in an amount to be proven at trial, including pre-judgment interest thereon;

(b)     Awarding general, consequential, incidental and other damages according to proof; and

(c)     Such other and further relief as the Court may deem just and proper.

### JURY TRIAL DEMANDED

Plaintiffs hereby demand a trial by jury.

Dated: June 23, 2009

KAPLAN FOX & KILSHEIMER LLP

By: _Charles J. Moxley_

Charles J. Moxley, Jr. (CM9781)
850 Third Avenue, 14th Floor
New York, NY 10022
Telephone: (212) 687-1980
Facsimile: (212) 687-7714
cmoxley@kaplanfox.com
*Attorneys for Plaintiffs*